319 S.W.3d 759 (2010)
In the Interest of D.J.R., E.N.R., and A.D.R., Minor Children.
No. 08-07-00354-CV.
Court of Appeals of Texas, El Paso.
January 6, 2010.
Opinion Denying Rehearing February 17, 2010.
*761 John Gates, El Paso, TX, for Appellant.
Bernardo Gonzalez, Attorney at Law, Patrick A. Lara, Law Office of Patrick Lara, Richard Deck, Assistant County Attorney, Theresa Caballero, Celia Villasenor, El Paso, TX, Trevor Woodruff, Office of General Counsel, TDFPS, Austin, TX, for Appellees.
Before CHEW, C.J., McCLURE, and RIVERA, JJ.

OPINION
ANN CRAWFORD McCLURE, Justice.
This appeal arises from the termination of parental rights. The trial court found by clear and convincing evidence that termination of the parent-child relationship *762 between D.R. and his children was in the children's best interest and that Appellant had engaged in acts or conduct that satisfied one or more of the statutory grounds. D.R. complains of evidentiary error, and assails the constitutionality of Section 263.405 of the Texas Family Code. For the reasons that follow, we affirm.

FACTUAL/PROCEDURAL BACKGROUND
D.R. is the biological father of the three children at issue. His seven-month-old daughter passed away on March 15, 2006 and D.R. was arrested and charged with capital murder in her death. On June 20, 2006, the Department of Protective and Regulatory Services filed suit to terminate his parental rights on the statutory grounds that (1) he placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, and (2) that he engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the child. On November 14, 2007, the trial court judge signed the final "Order of Termination" which incorporated by reference and rendered final the interlocutory decree of termination dated September 25, 2007. An amended notice of appeal and a notice of points to be presented on appeal, with objection, was timely filed on November 27, 2007. Following a hearing, the trial court determined that the stated points for appeal were frivolous. A notice of accelerated appeal was timely filed on December 13, 2007.
We ordered the parties to submit briefing related to the trial court's determination that the appeal was frivolous, and following submission of those briefs, we reversed and ordered that the parties brief the merits. The issues, having been fully briefed, are now ripe for consideration.

EVIDENTIARY ERROR
In Point of Error One, D.R. complains that the county medical examiner, Dr. Paul Shrode was not qualified as an expert to testify concerning the cause of death of D.J.R.

Standard of Review
A trial court's acceptance of an expert's qualifications is reviewed for an abuse of discretion. Broders v. Heise, 924 S.W.2d 148, 151 (Tex.1996). Absent an abuse of discretion, we will not interfere with the exercise of the trial court's discretion. "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549, 558 (Tex.1995). The party offering the expert's testimony bears the burden to prove that the witness is qualified under the Texas Rules of Evidence. Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.
TEX.R.EVID. 702. See Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex.1998); Broders, 924 S.W.2d at 151. The role of the trial court in qualifying experts is to ensure "that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." Broders, 924 S.W.2d at 152. The offering party must demonstrate that the expert witness possesses special knowledge as to the very *763 matter on which he proposes to offer an opinion. Gammill, 972 S.W.2d at 718.

Testimony
Dr. Shrode testified that he is the Chief Medical Examiner for El Paso County and has served in that capacity for a little over a year-and-a-half. He has approximately ten years of experience as a forensic pathologist. Dr. Shrode received special training in forensic pathology after earning a medical degree from Texas Tech University. For seven years, he worked for Harris County as a medical examiner. He then returned to Lubbock, and finally moved to El Paso. He is licensed to practice medicine in Texas and is board certified in forensic pathology. He is required to obtain continuing education under his medical license. Dr. Shrode has been published in a few toxicology journals and has been recognized as an expert in El Paso County in five or six criminal cases. He has testified over 200 times in Harris County and has performed over 4,000 autopsies.
Dr. Shrode testified that his job as Chief Medical Examiner is to determine a cause of death in cases that fall within his jurisdiction. Forensic pathology is a recognized specialty and there is an accepted curriculum for training to achieve this specialty. Specifically, one must complete a residency in pathology before choosing a sub-specialty, such as forensic pathology.
During voir dire, Dr. Shrode testified that his theory regarding the child's autopsy and cause of death was based on scientific principles. Based on the autopsy, the investigation reports, and his own experience, Dr. Shrode opined that the infant's cause of death was non-accidental cranial cerebral trauma. The cranial cerebral trauma was supported by brain swelling, blood around the retina, and blood under the protective cover of the brain. Dr. Shrode personally collected all the fluid and tissue samples.
Dr. Shrode testified that pathologists rely upon literature and experience rather than pure mathematics and science in performing autopsies. When asked about the rate of error in cause of death determinations, he admitted there is disagreement within the medical community concerning whether cranial cerebral trauma can be caused by shaking alone, or requires shaking accompanied by some sort of impact. He bases his opinions on publications and peer review that are well-established within the medical community in his area of practice.
Dr. Shrode learned during residency and fellowship training to approach a child's death as a homicide until proven otherwise. As a doctor, he must eliminate all possibilities until he concludes there is "no way" the child died of natural causes. According to Dr. Shrode, the injury the child sustained was a "significant trauma" which required "a lot of force." Based on the facts that were presented to him and the finding that trauma was inflicted, Dr. Shrode concluded, "it just doesn't fit that [her injury] just happened."
When asked on voir dire about his membership in the State Bar of Texas, Dr. Shrode testified that in 1979 he took a provisional course to go to law school at Southwest Texas State University. When the school did not obtain accreditation, the course became a paralegal program. After graduation, Dr. Shrode went to work for the Legal Aid Society and became a member of the State Bar of Texas through the paralegal division. Because the degree was conferred through the graduate Department of Political Science, Dr. Shrode believed he had a law degree. After hearing the arguments of counsel, the trial court ruled that he qualified as an expert.

*764 Expert Qualifications

D.R. complains of Dr. Shrode's "lack of expertise, his unreliable methodology, and his lackluster publishing record". He contends that the coroner's "homespun ideas about infant death" are neither generally accepted by the medical community nor grounded in the methods and procedures of science. We conclude that the record proves otherwise.
We have already recounted Dr. Shrode's education, medical background, and prior employment as a forensic pathologist. He is the Chief Medical Examiner for El Paso County. He is a licensed medical doctor who is board certified in forensic pathology. He concluded that the child's cause of death was cranial cerebral trauma based on the autopsy and investigation. We perceive no abuse of discretion in the trial court's finding that Dr. Shrode was qualified to testify as an expert. D.R.'s appellate challenge is limited to whether the trial court abused its discretion in finding that Dr. Shrode qualified as an expert witness, not whether his expert testimony was reliable. Vela v. State, 209 S.W.3d 128, 131 (Tex.Crim.App.2006). Any argument regarding the reliability of his testimony has not been properly preserved. Tex.R.App.P. 33.1. We also conclude that evidence concerning the doctor's belief that he possess a law degree goes to the weight of the evidence rather than its admissibility. We overrule Point of Error One.

CONSTITUTIONALITY OF SECTION 263.405
In Points of Error Two and Three, D.R. contends that Section 263.405 of the Family Code is unconstitutional because it violates both the due-process clause and the separation-of-powers clause. In particular, he challenges Sections 263.405(b) and (i) which provide:
(b) Not later than the 15th day after the date a final order is signed by the trial judge, a party who intends to request a new trial or appeal the order must file with the trial court:
(1) a request for a new trial; or
(2) if an appeal is sought, a statement of the point or points on which the party intends to appeal.
. . .
(i) The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial.
Tex.Fam.Code Ann. § 263.405(b), (i)(Vernon 2008).

Due Process
D.R. contends that sub-section 263.405(b) and (i) are unconstitutional both facially and as applied because the expedited timetable deprives appellate counsel of a meaningful review of the trial record. A facial challenge to a statute is the most difficult because the challenger must establish that no set of circumstances exists under which the statute will be valid. Santikos v. State, 836 S.W.2d 631, 633 (Tex.Crim.App.1992); Ex parte Dave, 220 S.W.3d 154, 156 (Tex.App.-Fort Worth 2007, pet. ref'd). Since a statute may be valid as applied to one set of facts and invalid as applied to another, the challenger must first show that the statute is unconstitutional as applied to him. Santikos, 836 S.W.2d at 633; Ex parte Dave, 220 S.W.3d at 156. That the statute may be unconstitutional as applied to others is insufficient to support a facial challenge. Santikos, 836 S.W.2d at 633; Ex parte Dave, 220 S.W.3d at 156. When we are confronted with an attack on the constitutionality of a statute, we presume that the statute is valid and that the Legislature *765 has not acted unreasonably or arbitrarily. Rodriguez v. State, 93 S.W.3d 60, 69 (Tex. Crim.App.2002). The burden rests on the individual who challenges the statute to establish its unconstitutionality. Id.
A claim that a statute is unconstitutional as applied is a claim that the statute, although generally constitutional, operates unconstitutionally as to the claimant. Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen, 952 S.W.2d 454, 461 n. 5 (Tex.1997). An as-applied challenger is required only to demonstrate that the statute operates unconstitutionally when applied to his particular circumstances. In re N.C.M., 271 S.W.3d 327, 328-29 (Tex.App.-San Antonio 2008, no pet.).
D.R. has not identified any appellate issue he was prevented from pursuing because of the restrictions in Section 263.405. Nor has he alleged that he would have discovered more issues if more time had been allowed. D.R. was appointed appellate counsel two and one-half months before the fifteen day deadline established in subsection (b). We recognize that our sister courts have found the provision unconstitutional as applied in cases where appellate counsel was not appointed until after the statement of points was due, and the Supreme Court recently held Section 263.405 unconstitutional to the extent it prevents a challenger from raising ineffective assistance or evidentiary sufficiency claims on appeal if those contentions were not first alleged in a statement of points. See In re J.O.A., 262 S.W.3d 7, 24 (Tex. App.-Amarillo 2008), aff'd in part, rev. in part, 283 S.W.3d 336 (Tex.2009); In re S.K.A., 236 S.W.3d 875, 894 (Tex.App.-Texarkana 2007, pet. denied); In re D.M., 244 S.W.3d 397, 415 (Tex.App.-Waco 2007, no pet.)(cases holding Section 263.405 unconstitutional as applied when appellant was not appointed counsel until after statement of points was due); see also In re J.O.A., 283 S.W.3d 336, 339 (Tex.2009)(concluding that Section 263.405(i) is unconstitutional to the extent it prevents claimants from raising ineffective assistance of counsel and insufficiency of the evidence when those claims are not first raised in a statement of points). Those factual scenarios are not before us. Because D.R. has not alleged there were other complaints he would have raised but for the restrictions of Section 263.405(b) and (i), he has not demonstrated the statute operated to deprive him of his rights to due process. In re V.G., No. 04-08-00522-CV, 2009 WL 2767040, *15 (Tex.App.-San Antonio Aug. 31, 2009, no pet.)(mem. op.); In re T.D.M., No 12-07-00458-CV, 2008 WL 2122601, *2 (Tex.App.-Tyler May 21, 2008, no pet.)(mem. op.); In re J.J., No. 2-06-333-CV, 2008 WL 623633, *1 (Tex.App.-Fort Worth Mar. 6, 2008)(mem. op.), pet. denied, 260 S.W.3d 461 (Tex.2008)(cases rejecting as-applied challenge when appellant did not identify how she was harmed by application of Section 263.405). Having determined that D.R. failed to demonstrate that the statute is unconstitutional as applied to him, we overrule Point of Error Two.

Separation of Powers
In Point of Error Three, D.R. asks us to hold Section 263.405 unconstitutional as a violation of the separation-of-powers clause, in conjunction with our sister court's decision in In re D.W., 249 S.W.3d 625 (Tex.App.-Fort Worth), pet. denied, 260 S.W.3d 462 (2008). We need not reach the constitutionality of the statute under the separation-of-powers clause as D.R. has wholly failed to show how he was harmed by its application to his case. See VanDevender v. Woods, 222 S.W.3d 430 (Tex.2007)(noting that courts should rest decisions on non-constitutional grounds, if *766 available, and not "wade into ancillary constitutional questions."); In re B.L.D., 113 S.W.3d 340, 349 (Tex.2003)("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds."). Nowhere in his brief does D.R. identify any issues that were preserved in the court below but not raised on appeal because those issues were not included in his statement of points. See, e.g., Walker v. Texas Dept. of Family and Protective Services, 312 S.W.3d 608, 620, 625 (Tex.App.-Houston [1st Dist.] 2009, pet. filed) (refusing to reach the constitutionality of Section 263.405 under the due-process clause and separation-of-powers clause absent a showing that the operation of the challenged statute caused appellant harm); In re M.M.F., No. 2-08-014-CV, 2008 WL 5265033, *7 (Tex.App.-Fort Worth Dec. 18, 2008, no pet.)(mem. op.)(refusing to address constitutionality of Section 263.405 under the separation-of-powers clause when the alleged harmthat he did not timely file a statement of pointswas moot since the trial court granted an extension to file a statement of points and appellant later filed his statement of points); In re H.B., No. 2-06-102-CV, 2006 WL 3438193, *2 (Tex.App.-Fort Worth Nov. 30, 2006, no pet.)(mem. op. on reh'g)(refusing to address appellant's argument on separation-of-powers principle when trial court granted the requested relief and appellant failed to demonstrate harm). As such, any opinion we render on the constitutionality of Section 263.405 under the separation-of-powers clause would address only a hypothetical injury and therefore be advisory. See McAllen Med. Ctr., Inc. v. Cortez, 66 S.W.3d 227, 232 (Tex.2001); Valley Baptist Med. Ctr. v. Gonzalez, 33 S.W.3d 821, 822 (Tex.2000); Texas Ass'n of Business v. Texas Air Control Bd., 852 S.W.2d 440, 444 (Tex. 1993)(cases holding courts have no jurisdiction to render advisory opinions). This we cannot do. Accordingly, we overrule Point of Error Three and affirm the judgment of the trial court.
ANN CRAWFORD McCLURE, Justice, opinion on motion for rehearing.
We issued our original opinion on January 6, 2010. In the following days, a tsunami of public interest has flooded this community and our opinion has been swept along with the current. D.R. has filed a motion for rehearing asking us to revisit the expert qualifications of Dr. Paul Shrode, the El Paso County Medical Examiner, "in light of recent public inquiries into the extent and veracity of Dr. Shrode's stated professional qualifications." We begin with the simple observation that the issues surrounding Dr. Shrode now are not the same issues which were presented to the trial judge, the Honorable Alfredo Chavez, when this case was tried.[1]

PROCEDURAL POSTURE AT TIME OF TRIAL
The underlying proceeding began in June 2006 when the Texas Department of Protective and Regulatory Services filed an original petition for protection of a child, for conservatorship, and for termination of parental rights. The future of four children was at stake. A.S. is the mother of four children: A.R.D., born September 15, 2001; D.J.R., born August 13, 2004; and twin girls E.N.R. and A.D.R., born September 5, 2006. She was also the *767 mother of D.R. who died on March 15, 2006 at the age of seven months. The adjudicated father of A.R.D. is J.D. D.R. was the father of the infant decedent[2] and he is the father of D.J.R., E.N.R., and A.D.R. The parental rights of A.S., J.D., and D.R. have all been terminated. Only D.R. is a party to this appeal. Bruce Yetter and Richard Deck, Assistant County Attorneys, signed the pleadings and represented the Department through trial. D.R. was represented by Christopher Cox while A.S. was represented by Theresa Caballero. As required by the Texas Family Code, the trial court appointed Bernardo Gonzalez and Celia Villasenor as attorneys ad litem to represent the interests of the children. Gonzales represented A.R.D.; Villasenor represented D.R.'s children.

THE CHALLENGES TO DR. SHRODE
As the El Paso County Medical Examiner, Dr. Shrode conducted the autopsy of the infant D.R. Yetter called him as a witness on behalf of the Department. To clarify our initial opinion, we quote his testimony at length:
DIRECT EXAMINATION
(By Mr. Yetter): Good afternoon, Dr. Shrode. Please state your name completely for the record.
(Dr. Shrode): Paul Shrode.
Q: How are you employed, sir?
A: I'm the chief medical examiner for El Paso County.
[Permission to approach the witness granted]
Q: Doctor, how long have you been employed as a chief medical examiner?
A: A little over a year and a-half.
Q: And what is your total experience as a forensic pathologist?
A: Approximately ten years.
Q: And what is your education?
A: I got a medical degree from Texas Tech University. I got training in pathology during my residency. I was especially trained in forensic pathology and I worked for approximately seven years in Harris County as a medical examiner. From there I went to Lubbock for a couple of years and then here.
Q: All right. Doctor, I've placed in front of you an Exhibit 12-A which is your credentials, I believe.
A: Yes.
Q: And are they current as of today?
A: Yes.
Q: And your testimony here today is expected to be in your area of expertise?
A: Yes.
At this point, Yetter offered Dr. Shrode as an expert witness and offered Exhibit 12-A into evidence. Both Cox and Caballero objected to the lack of a proper predicate, whereupon Yetter continued:
Q: What exactly are your duties as the forensic pathologist?
A: Well, principally [it] is to determine a cause around a manner of death in every case that falls in our jurisdiction.
Q: And what is your authority or the scope if your authority insofar as all cases involving death?
A: Well, as per the Texas Code of Criminal Procedure, we have that authority. I believe it's 49.25.

*768 Q: And as the chief medical examiner for El Paso County, do you supervise or do you actually perform the autopsies and the investigation?
A: Well, about half of the autopsies I perform. There's another pathologist in our office who would do the other half.
Q: Is forensic pathology a recognized specialty in the field of medicine?
A: Yes.
Q: And is there an accepted level or an accepted curriculum for training that your have to undergo in order to achieve that specialty?
A: Yes, sir.
Q: And would you describe for the ladies and gentlemen of the jury some of the types of training and education that you go through in order to become a forensic pathologist?
A: Well, after the residency in pathology which is just essentially a study of diseases, you are selected to a sub specialty field of training. In this instance, forensic pathology, in which you learn the techniques for determining the causes of death and attaining a manner of death. Generally there's at least a year training, sometimes it's two, depends on the institution. I did my training in Cincinnati for a year.
Q: Besides your medical degree that you've already testified to as coming from Texas Tech, what other credentials or certifications have you obtained?
A: Of course we have to have a license to practice medicine in the State of Texas and I have that. I passed my forensic pathology boards which is an exam which is published by the American Board of Pathology. I'm also eligible for certification in what's called surgical pathology in which you look at breast biopsies and pap smears and that sort of thing. But the State of Texas requires that you need a license to practice and that you have that training in forensic pathology to be a medical examiner. [Emphasis added].
Let us pause here briefly. From this testimony, the trial court could reasonably infer that Dr. Shrode was board certified in forensic pathology. He had passed his board exams; he was also eligible for board certification in surgical pathology. In other words, the trial court could either infer that he was eligible for board certification in both forensic and surgical pathology, or that he was already board certified in forensic pathology and was eligible for certification in surgical pathology. It is within the province of the fact finder to consider the evidence and the reasonable inferences that may be drawn therefrom. Texas Tech University Health Sciences Center v. Lucero, 234 S.W.3d 158, 167 (Tex.App.-El Paso 2007, pet. denied). We continue with Dr. Shrode's direct examination.
Q: Is the certification of a medical examiner licensed by the State of Texas?
A: Yes.
Q: Are there any other special trainings that you go to as a normal course of your medical license or pathology license?
A: Well, of course there are all sorts of conferences and things which we can attend which may be directed at particular points of forensic pathology, accidents, suicides, homicides, that sort of thing when we have time.
Q: Are you required under your medical licensing in the State of Texas *769 to obtain continuing medical education?
A: Yes, sir. Every two years we have to perform a certain number of CMEs. They are called continuing medical education credits towards that license.
Q: And are you required similarly [sic] the same type of continuing medical education for your forensic pathology certification?
A: No, sir. Because it's not required, we don't. It's just the license in Texas. [Emphasis added].
Once again, this exchange infers that Dr. Shrode is board certified in forensic pathology. In response to a question couched in terms of "your forensic pathology certification," Dr. Shrode answered using the first person pronoun, "we." "We," i.e. "those of us who are board certified in forensic pathology," do not earn continuing medical education credits for forensic pathology "because it is not required." These inferences led to our misstatement in our initial opinion that Dr. Shrode was indeed board certified. He was not, and we regret the error. We now continue with Yetter's direct examination of Dr. Shrode.
Q: I notice that you had a pathology residency from 1991 to 1996 in Temple, Texas?
A: Yes, sir, Scott & White Hospital.
Q: And that was after you were a licensed physician?
A: Yes, sir.
Q: And then the forensic pathology fellowship for one year was after that?
A: Yes, sir.
Q: Since 1997, have you had any further educational training or experience?
A: Nothing other than just experience of being in forensic pathology.
Q: In the field of forensic pathology, is there an accepted manner of practice that physicians use in arriving at their conclusions, investigating the cause of death?
A: Yes, I believe there is a general approach to that. Yes.
Q: And is that the approach that you use in your analysis?
A: Yes, I try.
Q: Is it an exact science?
A: Not an exact science like you would consider mathematics, no.
Q: Is there some involvement of judgment?
A: Yes.
Q: And is that based on experience and training?
A: Yes.
Q: Did you perform the autopsy on [D.R.]?
A: Yes.
Yetter reoffered Dr. Shrode as an expert witness. Cox took the witness on voir dire outside the presence of the jury and questioned him concerning the reliability of the methodology he employed. Caballero then cross-examined Dr. Shrode on his credentials, particularly the representation on his curriculum vitae that he had a "[g]raduate law degree from school of political science."
[By Ms. Caballero]:I see that you are a member of the State Bar of Texas from '79 to '83?
[Dr. Shrode]: Yeah, but don't hold that against me.
Q: I am not aware of a law school at Southwest Texas?
A: There isn't.
Q: Can you explain that, out of curiosity?

*770 A: Yes. When I, about, this was in '84, '85, okay. In 1979 Southwest Texas State University at the time was on a provisional course to get, go to law school. So their first class was us.
Q: Okay.
A: And as it turns out they did not get the full status for a law school. So, it was under the auspices of the political science department that we did that. So, the program became a paralegal program.
And when I graduated from that six month or year study, I had a paralegal license, but no law license. So I went to work with the Legal Aide Society as a paralegal and we had to become members of the State Bar to do that, to be a paralegal with the Legal Aide Society of central Texas.
Q: So when you say you were a member of the State Bar of Texas, you were not a member as a lawyer?
A: I was a member as a paralegal, a legal assistant.
Q: And it was a year study?
A: Yes.
Q: So you got a law degree or you got a paralegal degree?
A: It was a paralegal degree. It was in the graduate school. They set it up through the graduate school, political science.
Q: So would you say that was a graduate law degree or a graduate paralegal degree?
A: Well, it started out as a law degree and since it was from the graduate department, I mean I don'tif that is not correct, then that can be changed. I don't know, I was under the impression it was a law degree from the political science school.
Q: Do you have a diploma that says you have a law degree?
A: No.
Q: So where did you get that impression that you have a law degree?
A: Well, [the curriculum vitae] doesn't say it is a law degree, does it? It says
Q: Graduate law degree from school of political science.
A: Well, it is a degree in law from the school of political science.
Dr. Shrode was then questioned on his policy of treating every child death as a homicide until proven otherwise. After Caballero passed the witness, Judge Chavez questioned Dr. Shrode as to whether he had published any articles and, if so, in which journals.[3] He also inquired whether Dr. Shrode had testified as an expert in the district courts of El Paso County.[4]
Both Cox and Caballero lodged objections to Dr. Shrode's qualifications as an expert, his dishonesty with his legal credentials, his credibility, the reliability of his theory of child deaths, and whether that is an accepted practice in the medical community. Yetter then advised the court that the issue of the law license had nothing to do with Dr. Shrode's medical license and forensic pathology background. He believed Dr. Shrode had the requisite training. A.R.D.'s attorney ad litem then offered his opinion:

*771 [By Mr. Gonzalez]:This isn't very complicated, Judge. Mr. Cox is correct when he mentioned Daubert Robinson.[5] Daubert Robinson gives us all the information we need in this case. Daubert Robinson says that it has to be within the field of his expertise. He can't be telling us about why plastics tear. That's not within the field of his expertise. He is a pathologist.
And number two, it has to be based on established techniques and literature. He has said that. If you will remember his answers very carefully, Judge, he says well, these are the techniques that I was taught in my residency. The literature says, the literature says, the literature says. He said that about three or four different times. That's all Daubert Robinson requires, so I think that is clearly met. This is what pathologists do. This is what a pathologist testifies to. That is clearly within Daubert Robinson.
* * * * *
He's very honestly saying there are some disagreements in the field, however the literature is telling us that these types of injuries can be diagnosed as non-accidental trauma.
Judge Chavez accepted him as an expert witness, and Dr. Shrode testified for the remainder of the day. He resumed his testimony the following morning and was questioned by Gonzalez:
[By Mr. Gonzalez]: I have only one more question regarding your CV sir, and the only thing I care about. Are you Board Certified in the field of forensic pathology, sir?
[Dr. Shrode]: Not yet.
Q: Are you on your way to becoming Board Certified in the field of forensic pathology?
A: Yes.
Q: And would you explain to the jury please what becoming Board Certified means?
A: In the forensic pathology the governing body that grants board certification requires two boards, one board in surgical pathology and another board in forensic pathology. I have taken and passed the forensic pathology portion. As I mentioned yesterday, I am eligible to take the anatomic portion. And until I do that, they do not award Board Certification. There is apparently a division in the board of pathology that may split and they will be separate at some time, but until then.
Q: And you're working on that Board Certification in the meantime, is that correct?
A: That's correct. [Emphasis added].
This is the first time Dr. Shrode directly addressed board certification. Cox and Caballero both subjected him to recross examination but neither addressed the subject of board certification. Nor did they renew their challenges to his qualifications based on this later testimony. While they attacked Dr. Shrode's credibility, credibility goes to the weight rather than the admissibility of the evidence. Olympic Arms, Inc. v. Green, 176 S.W.3d 567, 585 (Tex.App.-Houston [1st Dist.] 2004, no pet.)(jury is to assess the weight and credibility of an expert's proffered testimony), citing Robinson, 923 S.W.2d at 558 (there is a difference between the reliability of the underlying theory or technique and the *772 credibility of the witness who proposes to testify about it.).

STATUTORY QUALIFICATIONS OF A MEDICAL EXAMINER
The Texas Code of Criminal Procedure establishes the minimum qualifications of a medical examiner:
"The commissioners court shall appoint the medical examiner, who shall serve at the pleasure of the commissioners court. No person shall be appointed medical examiner unless he is a physician licensed by the State Board of Medical Examiners. To the greatest extent possible, the medical examiner shall be appointed from persons having training and experience in pathology, toxicology, histology and other medico-legal sciences. . . ."
TEX.CODE CRIM.PROC.ANN. art. 49.25 § 2 (Vernon 2006). Thus, regardless of whether Dr. Shrode was board certified in forensic pathology, he possessed the requisite qualifications to serve as the county medical examiner. Whether board certification should be added to the minimum qualifications is a matter we leave to the discretion of the Legislature.

D.R.'S MOTION VIS-A-VIS RECENT EVENTS
Local media publications in recent weeks have reported that the American Board of Pathology notified Shrode on October 28, 2003 that he did not pass all parts of the exams required for board certification. In 2008, the same board purportedly advised that he is no longer board-eligible. Of course, that is not part of the record before us. With limited exceptions not relevant here, an appellate court may not consider matters outside the appellate record. Siefkas v. Siefkas, 902 S.W.2d 72, 74 (Tex.App.-El Paso 1995, no writ), citing Sabine Offshore Service v. City of Port Arthur, 595 S.W.2d 840, 841 (Tex.1979). The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record. Tex. R.App.P. 34.1. And certainly, all of the attorneys could have inquired during the 2007 trial whether Dr. Shrode had taken the surgical pathology exam. While we understand the outrage over what may be considered disengenuous statements in light of current events, the appellate spotlight focuses on events developed at trial, not on speculation two years hence.

APPLICATION OF THE APPROPRIATE STANDARD OF REVIEW
Finally, we address D.R's comment that our "positive appraisal" of Dr. Shrode's expert qualifications "forms the basis of the court's opinion." We respectfully disagree as this statement disregards the applicable standard of review. The question is not whether members of this court believe that Dr. Shrode was qualified to testify as an expert. As we noted in our earlier opinion, the question is whether Judge Chavez abused his discretion in finding Dr. Shrode to be an expert. D.R. also complains that despite the doctor's "questionable methods of imprecise analytical skills," we believed "he was a qualified expert based on only two overriding criteria: his medical degree and his certification as a forensic pathologist." Again, this misstates the issue. The issue is whether Judge Chavez abused his discretion in finding Dr. Shrode to be an expert based on his medical license, his years of training in forensic pathology, his experience as a medical examiner, and the numerous autopsies he has performed. And yes, Judge Chavez could have reasonably inferred at the time he ruled upon the objections that Dr. Shrode was board certified. He was not asked to reconsider his ruling when the doctor acknowledged he was not certified, and Judge Chavez heard uncontradicted *773 evidence that certification is not statutorily required. We persist in our holding that no abuse of discretion has been presented. Robinson, 923 S.W.2d at 558 ("The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles."). With these comments and clarification, we deny the motion for rehearing.
NOTES
[1] D.R. concedes that "[t]o be sure, an appellate court is bound by the record on appeal. . ." but he argues that recently "critical information and vigorous, far-reaching debate has arisen in the public forum which discounts and evennegates Dr. Shrode's trial testimony and, by extension, calls into question this court's positive appraisal of his expert qualifications, an appraisal that forms the basis of the court's opinion."
[2] As we noted in our original opinion, D.R. was arrested and charged with capital murder in connection with the child's death.
[3] Dr. Shrode testified that "[t]here have been a few articles and I can't tell you how much, two or three, along the lines of toxicology." These were published in one or two toxicology journals.
[4] He had testified in five or six criminal cases in El Paso County and approximately 200 times in Harris County. He later testified that he had conducted more than 4,000 autopsies and external examinations.
[5] See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); E.I. duPont de Nemours & Co., Inc. v. Robinson, 923 S.W.2d 549 (Tex. 1995).